UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SKG INTERNATIONAL, INC.

       Plaintiff,                    Case No.
                                            Hon.

v.

SKG ITALIA, S.p.A., and
MICHELE BERNINI,
an individual

       Defendants.
_____/

**VERIFIED COMPLAINT**

There is no other civil action between these parties arising out
of the same transaction or occurrence as alleged in the Complaint.

SKG International, Inc. ("Plaintiff") states as follows:

1.     Plaintiff is a Delaware corporation with its headquarters in Clarkston, Michigan.

2.     SKG Italia, S.p.A. ("Defendant Italia") is an Italian corporation with its principal place of business in Parma, Italy.

3.     Michele Bernini ("Mr. Bernini") is an individual who, upon information and belief, resides in Parma, Italy.

4.  Venue is proper in this Court because, among other things, the parties consented to this venue. In addition, the contract at issue in this case contemplates partial performance in Michigan, which is why the parties consented to this venue.

5.  This Court has subject matter jurisdiction over this matter because there is diversity of citizenship, and the amount in controversy exceeds $75,000 exclusive of costs and interest.

6.  This Court has personal jurisdiction over Defendant Italia because it consented to be subject to the jurisdiction of this Court. This Court also has personal jurisdiction over Defendant Italia because the contract which is the subject of this Complaint, and to which Defendant Italia is a party, contemplates partial performance in Michigan.

7.  This Court has personal jurisdiction over Mr. Bernini because Mr. Bernini is on the Board of Directors of, and thus owes fiduciary duties to, Plaintiff, a corporation with its headquarters in Clarkston, Michigan. Mr. Bernini was on both Plaintiff's Board of Directors and, upon information and belief, Defendant Italia's Board of Directors when Plaintiff and Defendant Italia entered into the contract which is the subject of this Complaint, which contemplates partial performance in Michigan.

## FACTUAL BACKGROUND

### The License Agreement

8. Defendant Italia is in the business of manufacturing and selling air conditioning parts to the automotive market in Europe.

9. In connection with Defendant Italia's business, Defendant Italia created certain licensed technology and know-how.

10. In 2013, Defendant Italia and others formed Plaintiff to expand Defendant Italia's business into North America. The idea behind the creation of Plaintiff was to take advantage of Defendant Italia's licensed technology and know-how to form an entity to manufacture and sell Defendant Italia's products at a low cost to the North American market.

11. To accomplish this goal, Defendant Italia and Plaintiff entered into a license and technology transfer agreement, dated Nov. 1, 2013 (the "License Agreement"). A copy of the License Agreement is attached as **Exhibit A**.

12. Through the License Agreement, Defendant Italia transferred to Plaintiff an "exclusive, perpetual, irrevocable, fully paid-up right and license" to use Defendant Italia's "Intellectual Property Rights", which included the right to use and practice the Licensed Technology in the Territory. See Exhibit A, ¶ 2(a).

13. The License Agreement defined "Intellectual Property Rights" as "all intellectual property rights, including but not limited to the following: (i) Patents;

{00665598.1}                                    3

(ii) inventions, discoveries (whether patentable of not in any country), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology and technical data; and (iii) copyrights, copyright registrations, registered and unregistered designs." See Exhibit A, ¶ 1(a).

14. The License Agreement defined "Licensed Technology" to mean any and all information, "to the extent necessary or reasonably useful for the design, manufacture, production, assembly, use or sale of the Products…". See Exhibit A, ¶ 1(a).

15. The License Agreement defined the "Territory" as North America, South America and Central America. It defined "Products" to mean all products of Defendant Italia. See Exhibit A, ¶ 1(a); Exhibit B attached to Exhibit A.

16. Thus, in the License Agreement Defendant Italia transferred to Plaintiff an irrevocable, fully paid-up and perpetual license to all of its intellectual property rights and all information reasonably useful to design, manufacture and sell any products of Defendant Italia in North America, South America and Central America.

17. The License Agreement contains a non-compete provision restricting Defendant Italia from competing with Plaintiff or soliciting Plaintiff's customers during the term of the License Agreement anywhere in North American, Central America or South America. See Exhibit A, ¶ 6(d).

## Defendant Italia Refuses to Transfer Intellectual Property Rights and Licensed Technology

18. Plaintiff began operations in 2014.

19. From the very beginning, Defendant Italia refused to transfer critical information related to (1) the identity of the suppliers which supplied it with the components for its Products, and (2) the cost of the component parts of the Products and the manufacture of the Products themselves.

20. The importance of this information to the success of Plaintiff's business cannot be overstated. In the automotive industry, suppliers must be approved by a company's customers – and ultimately, must be approved *de facto* by automotive companies such as Mazda, Chrysler, BMW, and Tesla. It is time-consuming, expensive and difficult to qualify new suppliers for any part. This is why the License Agreement specifically requires Defendant Italia to transfer information related to qualified suppliers. See Exhibit A, ¶ 2A(a)(iii).

21. As a result, using suppliers which have already been approved saves enormous amounts of time and money. This is clearly information which is, "reasonably useful for the design, manufacture, production, assembly, use or sale of the Products", and which the License Agreement requires Defendant Italia to transfer to Plaintiff.

22.     The cost of component parts of the Products, and the manufacture of the Products, is equally essential. Without a knowledge of the actual cost to purchase supplies and manufacture parts, it is impossible to accurately quote business, budget, or efficiently manufacture the Products. Information related to these costs is undoubtedly reasonably useful for the design, manufacture, production, assembly, use or sale of the Products, and the License Agreement thus requires Defendant Italia to transfer this information to Plaintiff.

23.     And yet, despite Plaintiff's repeated requests, and the clear requirements of the License Agreement, Defendant Italia repeatedly failed and refused to transfer this critical information to Plaintiff. Plaintiff began requesting this information in 2014. Defendant Italia repeatedly and consistently refused to provide the information. At first, Defendant Italia did so by simply failing to provide the information. Later on, Defendant Italia explicitly refused to give pricing and supplier information, based on various arguments and excuses. See, e.g., Correspondence attached as Exhibit B.

24.     Defendant Italia simply decided it did not want to transfer information as the License Agreement clearly requires it to. As stated by Defendant Italia, "we can do, but is not due and at the moment we have decided not to give SKG INT [Plaintiff] the possibility to purchase directly from our supplier." See Exhibit B, Correspondence Dated July 3, 2015.

25. When Defendant Italia did finally give a list of its suppliers to Plaintiff, it made the list irrelevant by instructing its suppliers not to supply to Plaintiff. Defendant Italia, which upon information and belief has several commercial relationships with most of its suppliers, used its influence with these suppliers to prevent Plaintiff from receiving the parts it needed to independently make the Products and use the Licensed Technology as contemplated by the License Agreement.

26. In other words, Defendant Italia yet again prevented the transfer of "technology in tangible and/or intangible form and materials…of any technology" – part of the Licensed Technology Defendant Italia was obligated to transfer under the License Agreement. See Exhibit A, ¶ 1(a).

27. This is also a direct and complete violation of the most basic right under the License Agreement – the right Plaintiff has to use the Licensed Technology to make, use, sell, distribute and deliver the Products, and to import the Products and processes into the Territory. See Exhibit A, ¶ 2(a).

### Defendant Italia's Failure to Transfer Supplier and Pricing Information Makes Fully Independent Manufacturing Impossible

28. Without the identity of the suppliers approved to make the components for the Products, and then the ability to order supplies from these suppliers, it has been impossible for Plaintiff to manufacture the Products independent of Defendant Italia.

29. All of Plaintiff's Directors, including Mr. Bernini, who is also a director of Defendant Italia, agreed that purchasing directly from current suppliers of Defendant Italia is critical to Plaintiff acquiring the ability to manufacture the Products independently from Defendant Italia. See Meeting Minutes of January 25, 2016, Exhibit C.

30. All of Plaintiff's Directors, including Mr. Bernini, agreed that Plaintiff needed its costs to be transparent, rather than simply relying completely on Defendant Italia to set prices from products it purchases from suppliers. See Exhibit C.

31. Nevertheless, Defendant Italia has refused to provide this information and then to permit supply. Defendant Italia's refusal to perform as the License Agreement requires has rendered Plaintiff completely dependent on Defendant Italia for supply of the Products.

**Defendant Italia Holds Plaintiff Hostage**

32. Because Defendant Italia refused to transfer the Intellectual Property Rights and Licensed Technology, including but not limited to the identity of suppliers and pricing information, Plaintiff was forced to purchase components from Defendant Italia as the sole source supplier.

33. Defendant Italia understood that this gave it enormous control over Plaintiff contrary to the intention of the License Agreement. This is particularly true because the automotive industry operates on a just-in-time inventory model.

34. Plaintiff's customers maintain approximately a 10 day inventory of Plaintiff's Products. The customers generally request shipments from Plaintiff weekly to maintain their inventories, which are shipped to the customer by truck. The customers in turn use the Products to assemble their products and ship to the OEM. If shipments are not timely received by any link the supply chain, then delays could arise in the downstream, which may eventually shut down the OEM's assembly line.

35. Plaintiff issued purchase orders to Defendant Italia, which provided (i) payment net 60 invoice date and (ii) shipment by sea. See, e.g., Purchase Orders, Exhibit D. These terms are standard in the industry.

36. When Defendant Italia later became convinced that Plaintiff constituted not a business opportunity, but instead competition, it exercised its control as a sole source supplier to squeeze Plaintiff from the marketplace.[1]

37. Because Plaintiff was dependent on Defendant Italia for component parts and despite the purchase order terms, Defendant Italia was able to unilaterally

---

[1] This change of view came about for several reasons, including but not limited to a significant drop in the value of the Euro against the dollar, making it more realistic for Defendant Italia to supply to American customers.

{00665598.1} 9

change the payment and shipping terms of Plaintiff's purchase orders. Defendant Italia reduced Plaintiff's credit limit to 160,000 Euros, and, as a practical matter, reduced payment terms to ten days. This effectively required Plaintiff to purchase parts in much smaller quantities shipped by air. See August 30, 2016 Board Minutes Exhibit E.

38. Plaintiff had little to no leverage to negotiate on payment and delivery terms because Defendant Italia was its sole source supplier, and its customers used just-in-time inventory practices – meaning even a short interruption in supply would be devastating to its business.

39. Shipment by air costs a prohibitive 30 to 40% of the cost of the product to be sold – essentially making it all but certain that Plaintiff will lose money on every part it manufactures (by comparison, shipment by sea costs roughly 8% of the cost of the product). Since Plaintiff's customers pay on customary terms, in approximately 60 days, 10 day payment terms makes it impossible for the Plaintiff to operate because it never has any cash. As a result, Plaintiff was unable to normalize its cash-flow and could not keep up with its royalty payment obligations under the License Agreement.

## Defendant Italia's Alleged Termination and Breach Contact with Plaintiff's Customers

40. After refusing to transfer the Intellectual Property Rights and Licensed Technology as the License Agreement required, making it impossible for Plaintiff

{00665598.1}                                                 10

to independently manufacture the Products, and then, acting as a sole supplier, tightening payment terms to the point where payment was impossible, Defendant Italia declared a default under the License Agreement claiming that Plaintiff had failed to pay royalties.

41. Defendant Italia declared this default and purported to terminate the License Agreement despite the fact that it had agreed to suspend royalty payments (although royalties would accrue) because of Plaintiff's cash flow problems – cash flow problems that Defendant Italia had caused.

42. Moreover, while the License Agreement required Plaintiff to pay certain royalties to Defendant Italia, it required these payments as consideration for the transfer of the Intellectual Property and Licensed Technology – which Defendant Italia had refused to do from the very first day the License Agreement was in force. See Exhibit A, ¶¶ 4.1 and 2A.

43. Then, on November 24, 2016, Defendant Italia made its final move to kill the company it had come to view as its competition. It informed Plaintiff that it would suspend all deliveries and hold all purchase orders until certain invoices are paid. See Correspondence, Exhibit F.

44. At the same time, Defendant Italia breached the License Agreement yet again by communicating with – and soliciting – Plaintiff's customers. Defendant Italia secretly informed Plaintiff's customer, Valeo, that it ceased shipping to

Plaintiff, and that Plaintiff was not stable financially. See Correspondence, Exhibit G. Defendant Italia also communicated with another customer, Modine, and asked that Modine switch from Plaintiff to Defendant Italia.

45. Defendant Italia has stopped shipping to Plaintiff. As a result, Plaintiff currently has only 7-14 days of goods remaining before it will be unable to supply its customers, which will then be unable to supply the OEMs, and have the downstream effect of shutting down the OEMs' factories, potentially laying off hundreds of workers, and costing Plaintiff millions of dollars in chargebacks under its agreements.

46. Valeo has informed Plaintiff of these catastrophic risks in no uncertain terms. See Correspondence, Exhibit H. Because of the failure to ship, the automotive supply chain could be shut down in as little as 14 days.

47. This will cause Plaintiff to incur a catastrophic loss of goodwill and reputation with its customers and in the industry, and force Plaintiff to go out of business.

## Count I – Injunctive Relief

48. Plaintiff incorporates each of the forgoing paragraphs as though fully set forth herein.

49. In order to avoid devastating and irreparable harm to Plaintiff as described above, Plaintiff requires immediate injunctive relief in the form of a

{00665598.1}                                    12

temporary restraining order which maintains the status quo between Plaintiff and Defendant Italia by restraining Defendant Italia from cutting off the component supply necessary for Plaintiff to manufacture and sell the Products as it is entitled to do under the Licensing Agreement under ordinary and customary terms and conditions.

50. Defendant Italia has cut off its supply of components to Plaintiff. Thus, as described above, as a function of the 'just-in-time' supply chain practices applicable to the customers, any delay in obtaining injunctive relief would result in irreparable harm to Plaintiff before a preliminary injunction hearing could be held.

51. Plaintiff also requires entry of a preliminary injunction upon the same terms to protect it from the devastating and irreparable harm described above until this action can be brought to trial.

52. Plaintiff is likely to succeed on the merits of its claims, including, but not limited to, its claim for breach of the Licensing Agreement. Defendant Italia repeatedly breached the License Agreement by failing to transfer its Intellectual Property and Licensed Technology critical to the manufacture and sale of the Products, and subsequently breached it yet again by soliciting Plaintiff's customers.

53. Defendant Italia will suffer little if any harm as the result of the entry of a temporary restraining order and a preliminary injunction. Supplying on customary terms and conditions for the manufacture of parts for which Plaintiff's

customers will pay will, at the very least, ensure payment of Defendant Italia for the parts supplied. The harm to Plaintiff in the absence of immediate injunctive relief far outweighs any harm that Defendant Italia could claim (if any) if injunctive relief is granted.

54. The public interest will be served by the grant of injunctive relief in favor of Plaintiff, by avoiding the interruption of the automotive supply chain, and the potential layoff of employees of both Plaintiff and other automotive companies.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant a temporary restraining order, followed by a preliminary injunction, restraining Defendant Italia and any persons acting in concert or cooperation with Defendant Italia from taking any action to interrupt the supply of components from Defendant Italia to Plaintiff, requiring Defendant Italia to continue supplying Plaintiff's requirements of components on ordinary and customary terms, and prohibiting Defendant Italia from communicating or contacting Plaintiff's customers regarding the supply of components or the Products, until June 1, 2017 or until further order of this Court.

### Count II – Breach of the Licensing Agreement

55. Plaintiff incorporates each of the forgoing paragraphs as though fully set forth herein.

56. The License Agreement is a binding contract entered into by Defendant Italia and Plaintiff.

57. Upon execution of the License Agreement, Defendant Italia was required to transfer the Intellectual Property Rights and the Licensed Technology, including all know-how, to Plaintiff.

58. Despite Plaintiff's repeated requests, Defendant Italia refused to transfer a critical portion of the Intellectual Property Rights and the Licensed Technology, supplier and cost information, to Plaintiff. Defendant Italia subsequently intervened to use its influence and make sure that its suppliers would not supply Plaintiff, thus insuring that Plaintiff would not receive the Licensed Technology to which it is entitled under the License Agreement.

59. Defendant Italia committed the first material breach the License Agreement by failing to transfer this know-how to Plaintiff.

60. Upon execution of the License Agreement and throughout the term of the License Agreement, Defendant Italia was prohibited from competing with Plaintiff in North America, South America and Central America.

61. Defendant Italia committed further breach of the License Agreement by contacting, communicating and soliciting Plaintiff's customers.

62. Defendant Italia has committed numerous other breaches of the License Agreement, including but not limited to (a) failing to compensate Plaintiff for sales

it made into the Territory, (b) charging Plaintiff for "fixed costs" on products which it purchased from third-party suppliers, the identity of which Defendant Italia should have transferred to Plaintiff, and (c) double-charging Plaintiff for the purchase of machines through which the Intellectual Property and Licensed Technology should have been transferred by charging both a purchase price and re-charging a "piece price".

63. Plaintiff has been damaged by Defendant Italia's breaches and its damages are continuing.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter a judgment in its favor and against Defendant Italia in an amount in excess of $75,000, together with interest, costs and reasonable attorneys' fees.

### Count III – Intentional Interference with Contractual Relationships and Business Expectancies

64. Plaintiff incorporates each of the forgoing paragraphs as though fully set forth herein.

65. Plaintiff has contracts with certain automotive suppliers to supply them with HVAC components (the "Contractual Relationships").

66. Plaintiff has business relationships and expectancies with such customers, expectancies of continued trade and future business with them, and

expectancies of future business opportunities with other suppliers in the automotive industry (the "Business Expectancies").

67. Defendant Italia has knowledge of the Contractual Relationships and Business Expectancies.

68. Defendant Italia wrongfully, deliberately and maliciously interfered with the Contractual Relationships and Business Expectancies through the acts and omissions described above.

69. The damage to Plaintiff's Contractual Relationships and Business Expectancies is not susceptible to complete, precise determination or calculation, and may include direct, indirect, incidental, consequential, exemplary and special damages.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter a judgment in its favor and against Defendant Italia in such amount in excess of $75,000, together with interest, costs and reasonable attorney fees.

## Count IV – Breach of Fiduciary Duty

70. Plaintiff incorporates each of the forgoing paragraphs as though fully set forth herein.

71. Mr. Bernini is a director of Plaintiff and of Defendant Italia.

72. As a director of Plaintiff, Mr. Bernini has a fiduciary duty of good faith and loyalty to Plaintiff.

73. Mr. Bernini has repeatedly breached his fiduciary duty to Plaintiff by, among other actions: (a) acting during Plaintiff's Board of Directors meetings in a manner and for the purpose of advancing the interests of Defendant Italia at the expense of Plaintiff, (b) repeatedly refusing to instruct or advocate that Defendant Italia act to transfer the Intellectual Property and the Licensed Technology, and maintaining that Defendant Italia had no obligation to do so, (c) advising, instructing, and/or acting on behalf of Defendant Italia to tighten price and shipping terms to Plaintiff, (d) attempting to solicit Plaintiff's customers on behalf of Defendant Italia, (e) giving Plaintiff's proprietary financial information to Plaintiff's customers, and (f) upon information and belief, pressuring Defendant Italia's suppliers to refuse to supply Plaintiff.

74. Plaintiff has been damaged by Mr. Bernini's breaches of fiduciary duty. Damages include direct, indirect, incidental, consequential, exemplary and special damages.

**WHEREFORE**, Plaintiff respectfully requests this honorable Court enter a judgment in its favor and against Defendant Italia in such amount in excess of $75,000 to which Plaintiff may be entitled, together with interest, costs and reasonable attorneys' fees.

**WHEREFORE**, Plaintiff respectfully requests this honorable Court enter a judgment in its favor and against Defendant Italia in such amount in excess of $75,000 to which Plaintiff may be entitled, together with interest, costs and reasonable attorneys' fees.

**VERIFICATION OF COMPLAINT**

The undersigned, Tony Kayyod, hereby certifies and says that he has read the foregoing Verified Complaint and that the statements of fact contained therein are true and correct.

By: _/s/ Tony Kayyod_____
    Tony Kayyod
Its:   CEO_____

Respectfully Submitted,

SCHAFER AND WEINER, PLLC

By:   /s/ Joseph K. Grekin
      JOSEPH K. GREKIN (P52165)
      JOHN J. STOCKDALE, JR. (P71561)
      Counsel for SKG International, Inc.
      40950 Woodward Ave., Ste. 100
      Bloomfield Hills, MI 48304
      (248) 540-3340
      grekin@schaferandweiner.com

Dated: December 30, 2016